UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X

ESTER LELCHOOK, individually and as personal
representative of the Estate of David Martin Lelchook;
MICHAL LELCHOOK; YAEL LELCHOOK;
ALEXANDER LELCHOOK, individually and as personal
representative of the Estate of Doris Lelchook; MALKA
KUMER; CHANA LIBA KUMER; MIRIAM
ALMACKIES; CHAIM KAPLAN; RIVKA KAPLAN;
BRIAN ERDSTEIN; KARENE ERDSTEIN; MA'AYAN
ERDSTEIN; CHAYIM KUMER; NECHAMA KUMER;
LAURIE RAPPEPORT; MARGALIT RAPPEPORT;
THEODORE (TED) GREENBERG; MOREEN
GREENBERG; JARED SAUTER; DVORA CHANA
KASZEMACHER; CHAYA KASZEMACHER
ALKAREIF; AVISHAI REUVANE; ELISHEVA ARON,
YAIR MOR; and MIKIMI STEINBERG,

No. 18-cv-12401-GBD-KHP

**FIRST AMENDED
COMPLAINT**

Jury trial demanded

Plaintiffs,

-against-

LEBANESE CANADIAN BANK, SAL, and
MOHAMED HAMDOUN,

Defendants.

------------------------------------------------------------------ X

Plaintiffs, complaining of the Defendants, by their attorneys, The Berkman Law Office,

LLC, allege for their First Amended Complaint as follows:

### **NATURE OF THIS ACTION**

1.      This is a civil action for damages under the Antiterrorism Act ("ATA), 18 U.S.C.

§ 2333, which arises from a series of terrorist rocket and missile attacks on civilians in Israel

carried out by the Hizbollah terrorist organization during July and August 2006 (collectively hereinafter: "Hizbollah Rocket Attacks").

2.      The plaintiffs are the estate and family members of David Martin Lelchook, a U.S. citizen who was murdered in the Hizbollah Rocket Attacks on August 2, 2006, and other American citizens who were harmed by or as a result of the Hizbollah Rocket Attacks.

3.      The defendants are Lebanese Canadian Bank, SAL, and its former senior manager and major shareholder, Mohamed Hamdoun, who intentionally and/or recklessly provided extensive banking services to Hizbollah, which caused, enabled and facilitated the Hizbollah Rocket Attacks in which the decedent was murdered and the other plaintiffs were harmed.

## THE PARTIES

4.      Plaintiff Ester Lelchook, at all times relevant hereto, is and was the widow and sole heir of United States citizen David Martin Lelchook, and the personal representative of the Estate of David Martin Lelchook. Plaintiff Ester Lelchook brings this action individually and on behalf of the Estate of David Martin Lelchook.

5.       Plaintiff Michal Lelchook, at all times relevant hereto, is and was a United States citizen and the daughter of David Martin Lelchook.

6.      Plaintiff Yael Lelchook, at all times relevant hereto, is and was a United States citizen and the daughter of David Martin Lelchook.

7.      Plaintiff Alexander Lelchook, at all times relevant hereto, is and was a United States citizen, the brother of David Martin Lelchook, and the personal representative of the Estate of the late Doris Lelchook. Doris Lelchook, at all times relevant hereto, was a United States citizen and

the mother of David Martin Lelchook. Plaintiff Alexander Lelchook brings this action individually and on behalf of the Estate of Doris Lelchook.[1]

8.     The other plaintiffs herein are all United States citizens who were injured by or as a result of the Hizbollah Rocket Attacks. The details of those attacks and the nature of those plaintiffs' injuries are set forth below.

9.     Defendant Lebanese Canadian Bank, SAL ("LCB") is a privately-owned banking corporation organized under the laws of Lebanon and headquartered in Beirut, Lebanon.

10.     Defendant LCB intentionally and/or recklessly provided extensive banking services to Hizbollah, which caused, enabled and facilitated the terrorist rocket attacks in which the plaintiffs were harmed. Most of the banking services which were provided by LCB to Hizbollah and which harmed the plaintiffs were carried out by LCB in and through the State of New York.

11.     Defendant Mohamed Hamdoun ("Hamdoun") served as the Deputy General Manager of LCB during the years prior to the Hizbollah Rocket Attacks. During that period Hamdoun also served on LCB's Executive Board, and as the Vice Chair of LCB's Anti-Money Laundering Committee. During that period Hamdoun also held at least 20% of LCB's shares. During that period Hamdoun authorized and carried out, personally and through subordinates who were LCB managers, officers and employees, LCB's actions detailed in this First Amended Complaint. Hamdoun currently serves as one of LCB's two liquidators.

---

[1] Plaintiffs Ester Lelchook (individually and as personal representative of the estate of David Martin Lelchook), Michal Lelchook, Yael Lelchook, and Alexander Lelchook (individually and as personal representative of the estate of Doris Lelchook), are sometimes referred to collectively herein as the "Lelchooks."

## JURISDICTION

12.     This court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States, including 18 U.S.C. § 2333.

## PRECLUSION

13.     On June 9, 2021, the Court of Appeals for the Second Circuit held that the Second Amended Complaint in *Kaplan (Licci) v. Lebanese Canadian Bank, SAL*, 08-cv-7253-GBD (S.D.N.Y.), states a valid claim against LCB for aiding and abetting under 18 U.S.C. § 2333. *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021).

14.     Because the Second Amended Complaint in *Kaplan* is identical to this First Amended Complaint in all relevant respects, LCB and Hamdoun (who is in privity with LCB), are bound in this action by the decision of the Court of Appeals in *Kaplan*.

## STATEMENT OF FACTS

### Hizbollah

15.     Hizbollah was established in Lebanon circa 1982.

16.     At all times relevant hereto Hizbollah is and was a radical Islamic terrorist organization which views the State of Israel, the United States and other Western countries as its enemies.

17.     At all times relevant hereto Hizbollah sought, as an official and publicly-stated policy and goal of Hizbollah, to destroy the State of Israel and murder or expel its Jewish residents.

18.     At all times relevant hereto Hizbollah sought, as an official and publicly-stated policy and goal of Hizbollah, to ethnically cleanse the territory of the State of Israel of its Jewish population.

19.     Since its founding and until July 12, 2006 (and until the present day), Hizbollah has sought to achieve its goal of destroying the State of Israel and murdering or expelling its Jewish residents through the use of terrorist attacks on Jewish civilians in Israel and elsewhere.

20.     Since its founding and until July 12, 2006 (and until the present day), Hizbollah carried out hundreds of terrorist attacks against Jewish civilians in Israel and elsewhere, which have killed hundreds of innocent civilians and wounded hundreds more.

21.     Since its founding and until July 12, 2006 (and until the present day), Hizbollah has used terrorism against Jewish civilians in Israel and elsewhere in order to coerce, intimidate and influence the Israeli government and public, and thereby ultimately bring about the destruction of the State of Israel and the murder or expulsion of the Jews in Israel.

22.     Since its founding and until July 12, 2006 (and until the present day), Hizbollah has also carried out hundreds of terrorist attacks against American targets which have killed hundreds of U.S. citizens and wounded hundreds more.

23.     Between 1982 and July 12, 2006, Hizbollah's policy and practice of carrying out terrorist attacks against Jewish civilians in Israel and elsewhere, and against United States targets, was notorious and well known to defendants and to the public at large.

24.     Hizbollah's policy and practice of carrying out terrorist attacks against Jewish civilians in Israel and elsewhere and against United States targets was notorious and well known to the defendants and to the public at large between 1982 and July 12, 2006, because during this period Hizbollah openly, publicly and repeatedly acknowledged having such a policy and carrying out such attacks. Hizbollah made these acknowledgments on its official websites, in its official press releases, on its official television station, Al-Manar, on its official radio station, Al-Nour,

and in numerous press conferences and news media interviews conducted by senior Hizbollah officials.

25.    Additionally, Hizbollah's policy and practice of carrying out terrorist attacks against Jewish civilians in Israel and elsewhere and against United States targets was notorious and well known to the defendants and to the public at large between 1982 and July 12, 2006, because since its founding, Hizbollah has committed multiple such acts of terrorism, including but not limited to the following:

a)    The July 19, 1982, kidnapping of American University president David S. Dodge in Beirut.

b)    The April 18, 1983, car bomb attack on the United States Embassy in Beirut in which 63 people were killed.

c)    The October 23, 1983, truck bomb attack on the U.S. Marine barracks in Beirut in which 241 American military personnel were killed.

d)    The September 20, 1984, car bomb attack on the U.S. Embassy annex in Beirut in which two Americans and 22 others were killed.

e)    The March 16, 1984, kidnapping and murder of William Buckley, a CIA operative working at the U.S. Embassy in Beirut.

f)    The April 12, 1984, attack on a restaurant near the U.S. Air Force Base in Torrejon, Spain in which eighteen U.S. servicemen were killed and 83 people injured.

g)    The December 4, 1984, terrorist hijacking of a Kuwait Airlines plane in which four passengers were murdered, including two Americans.

h)      The June 14, 1985, hijacking of TWA Flight 847 in which Robert Stethem, a U.S. Navy diver, was murdered. Other American passengers were held hostage before being released on June 30, 1985.

i)      The February 17, 1988, kidnapping and subsequent murder of U.S. Marine Col. William Higgins.

j)      The March 17, 1992, bombing of the Israeli Embassy in Buenos Aires that killed 29 people and injured over 200.

k)      The July 18, 1994, bombing of the Jewish community center in Buenos Aires that killed 86 people and injured over 200.

l)      The November 28, 1995, bombardment of towns in northern Israel with missiles aimed at Jewish civilians.

m)      The March 30, 1996, bombardment of northern Israeli towns with 28 missiles. A week later, Hizbollah fired 16 additional missiles, injuring 36 Israelis.

n)      The August 19, 1997, bombardment of northern Israel with dozens of missiles aimed at Jewish civilians.

o)      The December 28, 1998, bombardment on northern Israel with dozens of missiles aimed at Jewish civilians.

p)      The May 17, 1999 bombardment on northern Israel with dozens of missiles aimed at Jewish civilians.

q)      The June 24, 1999, bombardment on northern Israel, killing 2 people.

r)      The April 9, 2002, launching of missiles into northern Israeli towns.

s)    The August 10, 2003, firing of shells that killed a 16-year-old Israeli boy and wounded other Israelis.

26.    Additionally, Hizbollah's policy and practice of carrying out terrorist attacks was notorious and well known to defendants and to the public at large between 1982 and July 12, 2006, because between 1998 and July 12, 2006, the courts of the United States published numerous decisions finding that Hizbollah was responsible for carrying out such terrorist attacks.

27.    Additionally, Hizbollah's policy and practice of carrying out terrorist attacks against Jewish civilians in Israel and elsewhere and against United States targets was notorious and well known to defendants and to the public at large between 1982 and July 12, 2006, because Hizbollah has been designated by the U.S. Government as a Specially Designated Terrorist ("SDT") continuously since 1995, as a Foreign Terrorist Organization ("FTO") continuously since 1997, and as a Specially Designated Global Terrorist ("SDGT") continuously since 2001.

28.    Hizbollah is, and at all relevant times was, a complex, composite organization, which is composed of various subordinate entities which were created, and are entirely controlled, by Hizbollah. Hizbollah created, controls and operates these subordinate entities to carry out specific tasks or categories of tasks. These subordinate entities are integral, constituent parts of Hizbollah itself, and to the extent that these entities have any putative separate legal personality or corporate form, such personality or form is a sham aimed at assisting Hizbollah to conduct its criminal and terrorist activities using different names and aliases. Moreover, any separate legal personality or corporate form putatively enjoyed by these entities does not detract from the fact that they are inseparable and integral parts of the composite organization known as Hizbollah. As a Congressional Research Service Report accurately explained, "Lebanon's Hezbollah ('Party of God') is a Shiite Islamist militia, political party, social welfare organization, and U.S. State

Department-designated terrorist organization … Hezbollah has a unified leadership structure that oversees the organization's complementary, partially compartmentalized elements."[2] Similarly, terrorist expert Dr. Matthew Levitt has corrected noted that "Hezbollah is many things. It is one of the dominant political parties in Lebanon, as well as a social and religious movement … Hezbollah is also Lebanon's largest militia."[3] These characterizations were also correct before and as of 2006.

29.     One of Hizbollah's most important subordinate entities, which was created by and is and at all times was wholly controlled by Hizbollah, is the Shahid (Martyrs) Foundation (a/k/a Shahid (Martyrs) Organization) (hereinafter "Shahid").[4]

30.     Shahid is part of Hizbollah's Social Service Section, which a senior U.S. military analyst has correctly characterized as the "most important branch of the Hezbollah organization… The Social Service Section serves as an equal arm within the organization and is used as much as the military and political wing in terms of leverage."[5] Shahid's purpose is to provide financial and other material support to Hizbollah terrorists wounded in action, and to the families of Hizbollah terrorists killed in action. The purpose of that funding and support is to "provide peace of mind to current and prospective" Hizbollah terrorists, "by knowing that they and their families will be cared for in the event of death or injury."[6]

---

[2] Casey L. Addis and Christopher M. Blanchard, **Hezbollah: Background and Issues for Congress** (January 3, 2011), at 1, 10.

[3] Dr. Matthew Levitt, **On a Military Wing and a Prayer**, (February 12, 2013), https://www.washingtoninstitute.org/policy-analysis/view/on-a-military-wing-and-a-prayer.

[4] The name "Shahid," which is Arabic for "martyr," is sometimes spelled "Shaheed."

[5] Major James B. Love, **Hezbollah: Social Services as a Source of Power**, U.S. Joint Special Operations University (2010), at 21.

[6] *Id*. at 24.

31.     Two more critical Hizbollah-created and wholly-controlled subordinate entities within Hizbollah, during the years prior to and through 2006, were Bayt al-Mal and the Yousser Company for Finance and Investment ("Yousser"). In a statement issued on September 7, 2006, the U.S. Treasury correctly explained that:

> Bayt al-Mal is a Hizballah-controlled organization that performs financial services for the terrorist organization. Bayt al-Mal operates under the direct supervision of Hizballah Secretary General Hasan Nasrallah. As Hizballah's main financial body, Bayt al-Mal serves as a bank, creditor, and investment arm for Hizballah. …

> Bayt al-Mal utilizes the Yousser Company for Finance and Investment to secure loans and finance business deals for Hizballah companies.[7]

32.     Stuart Levey, the U.S. Treasury's Under Secretary for Terrorism and Financial Intelligence, correctly further explained that, "Bayt al-Mal and the Yousser Company function as Hizballah's unofficial treasury, holding and investing its assets and serving as intermediaries between the terrorist group and mainstream banks."[8]

## Defendants' Provision of Wire Transfer and Other Banking Services to Hizbollah

33.     Hizbollah is subject to strict economic sanctions programs imposed by the United States as the result of its designation as an SDT, FTO and SDGT (collectively hereinafter: "U.S. Sanctions Regime").

34.     The U.S. Sanctions Regime is intended to prevent Hizbollah from conducting banking activities, including wire transfers, and thereby limit its ability to carry out terrorist attacks.  Hezbollah requires banking services, including the ability to carry out wire transfers, in

---

[7]     **Treasury  Designation  Targets  Hizballah's  Bank**,  available  at:  https://home.treasury.gov/news/press-releases/hp83

[8] *Id.*

order to: (a) build and maintain its operational infrastructure for the planning and execution of terrorist attacks; (b) purchase and store weapons, explosives and other materiel used by it to carry out terrorist attacks; (c) pay, train, transport and shelter its terrorist operatives; and (d) carry out specific terrorist attacks.

35.     The U.S. Sanctions Regime is effective when it is observed and enforced.

36.     Hizbollah is unable to execute wire transfers and conduct other banking activities via banks and other financial institutions which observe and enforce the U.S. Sanctions Regime.

37.     If all banks and financial institutions worldwide observed and enforced the U.S. Sanctions Regime, the ability of Hizbollah to conduct banking activities would be severely restricted, and Hizbollah's ability to plan, to prepare and to carry out terrorist attacks would be significantly reduced.

38.     Nearly all banks and financial institutions around the world observe and enforce the U.S. Sanctions Regime.

39.     Hizbollah is therefore forced to conduct its banking activities using those very few banks and financial institutions which do not observe and enforce the U.S. Sanctions Regime.

40.     Defendant LCB did and does not observe or enforce the U.S. Sanctions Regime.

41.     Defendant LCB conducts and conducted much of its business in U.S. dollars.

42.     In order to execute U.S. dollar transactions, defendant LCB required a correspondent bank in the United States through which to carry out those dollar transactions.

43.     Accordingly, LCB sought and entered into a business relationship with American Express Bank Ltd. ("Amex Bank") in New York, pursuant to which Amex Bank served as a correspondent bank for LCB and carried out LCB's U.S. dollar transactions.

44.     Amex Bank served as a correspondent bank for LCB between 2004 (or earlier) and until July 12, 2006 (and later).

45.     Between 2004 (or earlier) and until July 12, 2006 (and later), Hizbollah continuously maintained bank accounts at various LCB branches in Lebanon titled to Shahid, including without limitation the following dollar accounts:

- 207-108987
- 207-108987-2-521-0
- 207-108987-2-521-1
- 207-108987-2-521-9
- 207-108987-2-571-0

46.     During the same period (2004 or earlier through 2006 and later), LCB also opened and continuously maintained accounts for Hizbollah's Bayt al-Mal. These accounts, which were nominally listed in the names of Bayt al-Mal and Hezbollah leaders Husayn al-Shami (a/k/a Hussein Ali Mohamed Chami) and Wahid Mahmoud Sbeity, included the following:

- 213-130010-2-571-0 (dollars)
- 213-130010-1-571-0 (Lebanese Lira)

47.     During the same period (2004 or earlier through 2006 or later), LCB also opened and continuously maintained accounts for Yousser (which, as noted, operated together with Bayt al-Mal as Hizbollah's treasury and investment arm). These accounts included the following:

**LCB Airport Branch**

- 70187 (Yousser central account)
- 207-70187-2-521-0 (dollars)
- 207-70187-69-521-0 (euro)

- 207-70187-2-401-0 (dollars)

**LCB Tyre Branch**

- 214-142610-2-571 (dollars)

48.     All of the Shahid, Bayt al-Mal and Yousser accounts described above are collectively referred to hereinafter as "Hizbollah Accounts."

49.     At all times, all of the Hizbollah Accounts belonged to Hizbollah and were under the control of Hizbollah.

50.     At all times, all of the funds held in the Hizbollah Accounts belonged to Hizbollah and were under the control of Hizbollah.

51.     At all times, all transactions carried out in all the Hizbollah Accounts were carried out by Hizbollah and at the direction of Hizbollah.

52.     Beginning in 2004, LCB began to provide extensive wire transfer services to Hizbollah via Amex Bank in New York.

53.     Specifically, between 2004 and July 12, 2006 (and subsequently), Hizbollah made and received many scores of dollar wire transfers via LCB totaling many millions of dollars (hereinafter: "Hizbollah Wire Transfers").

54.     All the Hizbollah Wire Transfers were made to, from and/or between the Hizbollah Accounts, via Amex Bank in New York.

55.     Amex Bank served as LCB's correspondent bank for the Hizbollah Wire Transfers and carried out the Hizbollah Wire Transfers on behalf of and in concert with LCB and Hizbollah.

56.     Thus, all the Hizbollah Wire Transfers were carried out in and through the State of New York, by both LCB and Amex Bank.

57. During the years prior to the Hizbollah Rocket Attacks, defendant Hamdoun held multiple, overlapping positions of power in LCB's corporate hierarchy:

      a.      Hamdoun was the **Deputy General Manager** of LCB;

      b.      Hamdoun was also an **Executive Board Member** of LCB;

      c.      Hamdoun was also **Vice Chair of LCB's Anti-Money Laundering Committee**; and

      d.      Hamdoun was also a **major shareholder of LCB**, holding at least 20% of LCB's shares.

58. These positions made Hamdoun one of the two most senior managers and policy-makers in LCB, and gave him control over LCB's policies and activities. By virtue of the authority and powers held by him in those interlocking board and management positions in LCB, and as a 20% owner of LCB, Hamdoun enjoyed control over LCB's operations, and over LCB's managers, officers and employees.

59. Hamdoun set the policy approving, initiated, directed, authorized, and carried out, personally and through subordinates who were LCB managers, officers and employees, LCB's actions detailed in this First Amended Complaint.

60. Hamdoun personally initiated and authorized LCB's banking relationship with Hizbollah, including the opening and maintenance of the Hizbollah Accounts, and the processing of the Hizbollah Wire Transfers.

61. Hamdoun also operated through his direct subordinate, Ahmad Safa ("Safa"), who was the Associate General Manager for Branches and Operations in LCB. Safa was responsible (*inter alia*) for overseeing all LCB branches. Safa functioned as Hamdoun's operational enforcer at LCB. Through his managerial and operational roles at LCB, and pursuant to the instructions of

Hamdoun, who was his superior and supervisor, Safa organized, directed and carried out on a day-to-day basis LCB's actions detailed in this First Amended Complaint.

62.     Safa opened the Hizbollah Accounts and managed them on a day-to-day basis in collaboration with Hizbollah, and carried out the Hizbollah Wire Transfers, pursuant to the direction and authorization of Hamdoun.

## The Hizbollah Rocket Attacks

63.     The Hizbollah Rocket Attacks were carried out between July 12, 2006 and August 14, 2006, when Hizbollah fired thousands of rockets and missiles at civilians in northern Israel.

64.     The decedent was murdered and the other plaintiffs were injured by the Hizbollah Rocket Attacks, as detailed below.

65.     On August 2, 2006, David Martin Lelchook, a 52-year old American citizen, was innocently riding his bicycle in Kibbutz Saar in the north of Israel, when a rocket launched by Hezbollah struck him.

66.     David Martin Lelchook was mortally injured by shrapnel from the initial blast and died thereafter.

67.     David Martin Lelchook was survived by his wife, plaintiff Ester Lelchook, his two daughters, plaintiffs Michal Lelchook and Yael Lelchook, his brother, plaintiff Alexander Lelchook, and his late mother, Doris Lelchook.

68.     The murder of David Martin Lelchook caused the decedent and his estate severe harm, including conscious pain and suffering, and pecuniary loss.

69.     The murder of David Martin Lelchook caused plaintiffs Ester Lelchook, Michal Lelchook, Yael Lelchook, Alexander Lelchook and the late Doris Lelchook severe and permanent psychological, emotional and financial harm, including loss of consortium and solatium.

4.      In a separate civil action against Syria, the U.S. District Court for the District of Columbia found that the Lelchooks are entitled to compensation for the murder of David Martin Lelchook, and the resulting injuries and harm to them and the estates, in the total amount of $20,535,665, apportioned as follows: $285,665 to Ester Lelchook, as the legal representative of David Lelchook's Estate; $6,250,000 to Michal Lelchook; $6,250,000 to Yael Lelchook; $2,750,000 to Alexander Lelchook; and $5,000,000 to the Estate of Doris Lelchook. *Lelchook v. Syrian Arab Republic*, No. 1:16-cv-1550-RC at DE 30-31.[9]

70.      In the summer of 2006, Malka Kumer was a 6-year-old living with her family in the small town of Safed, in the Upper Galilee region of Israel. During that summer she experienced hundreds of terrifying warning sirens followed by rocket strikes and explosions in, or within hearing distance of, Safed. She experienced and vividly recalls that summer as being spent running back and forth between the family home and a bomb shelter, always waiting in terror for the next attack. Those events severely and permanently traumatized Malka, and led directly to serious emotional problems that have afflicted her and disrupted her life ever since. The Hezbollah Rocket Attacks caused Malka severe and lasting psychological and emotional harm.

71.      Chana Liba Kumer, Malka's sister, was a 5-year-old living in Safed with her family in the summer of 2006. She, too, experienced and clearly recalls the sirens and explosions throughout July and August and repeatedly racing to the bomb shelter along with crowds of panicked neighbors. She asked her mother who was firing the rockets and why they wanted to kill her, when she hadn't done anything to them; she remembers her mother telling her that it was

---

[9] Because plaintiff Ester Lelchook is not a U.S. citizen, she did not have an individual cause of action under 28 U.S.C. § 1605A(c), and so did not seek or receive an individual damages award in the Lelchooks' action against Syria. But she is entitled to, and seeks, such an award in this action under 18 U.S.C. § 2333, as the survivor of U.S. citizen David Martin Lelchook.

"Hezbollah," but being unable or unwilling to explain further. She experienced her friends and their families leaving Safed for safer places after the rockets started falling, but her family being forced to stay behind, financially unable to leave, and simply praying for protection. She experienced being unable to go outside and play, staying indoors, at home or in a shelter, for over month, and hearing the chilling sounds of the warning sirens and the detonation of rockets. Chana Liba remembers not sleeping in her own room and bed during that period, as the family slept together on mattresses in the safest part of the apartment; and that when the attacks came during Shabbat meals, the entire family huddled together under the dining-room table for protection. All those experiences severely and permanently traumatized her. The Hezbollah Rocket Attacks caused Chana Liba Kumer severe and lasting psychological and emotional harm.

72.     In the summer of 2006, Miriam Almackies was an 18-year-old living in Safed with her three-month-old infant son. Her husband, an Israeli citizen, was away from home during the Hezbollah Rocket Attacks, having been called up to perform military service. Alone with her baby for the duration of the attacks, the 18-year-old Miriam lived in constant terror of death or serious physical injury both for her infant and herself. As a result of the Hezbollah Rocket Attacks, Miriam Almackies experienced horrific trauma, and suffered severe psychological and emotional injuries.

73.     On July 13, 2006, plaintiff Chaim Kaplan was severely injured by a Hizbollah rocket which landed in Safed next to his car. A second rocket struck the Kaplan family's home, narrowly missing Chaim's wife, plaintiff Rivka Kaplan. As a result of these rocket attacks plaintiffs Chaim Kaplan and Rivka Kaplan suffered severe physical, psychological, and emotional injuries. In separate civil actions against the Islamic Republic of Iran and North Korea, the U.S. District Court for the District of Columbia found that Chaim Kaplan's injuries entitle him to compensation in the amount of $3 million and that Rivka Kaplan's injuries entitle her to

compensation in the amount of $2.5 million. *Kaplan v. Central Bank*, Civ. No. 10-00483 (RCL) ("*Kaplan*") at DE 65.

74.     Plaintiffs Karen and Brian Erdstein resided in Safed at the time of the Hizbollah Rocket Attacks. Numerous rockets landed near the family's home. Karen was pregnant at the time the attacks began and due to the ongoing strain, stress and anxiety, and the rocket explosions near the Erdstein home she suffered a miscarriage and lost the baby. In the wake of the miscarriage, Karen suffered from post-partum depression, damage to her immune system and has developed other medical complications. Brian was greatly traumatized by the rocket attacks and the loss of the baby. In addition, as a result of the rocket attacks and the collapse of tourism in Israel, Brian, a licensed tour guide, lost all of his work and had extreme difficulties supporting his family. The Erdsteins' then-minor daughter, plaintiff Ma'ayan Erdstein suffered emotional and psychological trauma from the Hizbollah Rocket Attacks. Ma'ayan was diagnosed with permanent and severe emotional disorders and receives on-going psychiatric treatment and therapy. As a result of the Hizbollah Rocket Attacks, Brian, Karene and Ma'ayan Erdstein suffered severe physical, psychological, and emotional injuries. The *Kaplan* court found that the injuries suffered by Brian, Karene and Ma'ayan Erdstein entitle them to compensation in the amounts, respectively, of $2.5 million, $3.5 million, and $1.5 million. *Id*. at DE 65.

75.     Plaintiff Chayim Kumer, a resident of Safed, suffered a nervous breakdown and was hospitalized as a result of the Hizbollah Rocket Attacks, which in turn caused severe harm to his wife, plaintiff Nechama Kumer. As a result of the Hizbollah Rocket Attacks plaintiffs Chayim Kumer and Nechama Kumer suffered severe psychological and emotional injuries. The *Kaplan* court found that the injuries suffered by Chayim and Nechama Kumer entitle them to compensation in the amounts, respectively, of $2 million and $1.5 million. *Id*. at DE 65.

76.     On July 13, 2006 at approximately 7:00 p.m. a rocket launched by Hizbollah landed outside the home of plaintiffs Laurie Rappeport and her then-minor daughter Margalit in Safed. The powerful explosion threw Margalit, who was playing outside on a wall, a distance into the air. Laurie and Margalit suffered severe psychological trauma as a result of this rocket, and the carnage and destruction that they witnessed from other rockets which fell near their home. Ultimately, they fled the city. As a result of the Hizbollah Rocket Attacks Laurie and Margalit Rappeport suffered severe psychological and emotional injuries. The *Kaplan* court found that the injuries suffered by Laurie and Margalit Rappeport entitle them to compensation in the amounts, respectively, of $2.35 million and $1.5 million. *Id*. at DE 65.

77.     In the summer of 2006, plaintiffs Theodore (Ted) Greenberg and Moreen Greenberg were the proprietors of a business in Safed catering to tourists. The Hizbollah Rocket Attacks caused a complete halt in tourism in northern Israel for several months during the peak tourism season, which in turn caused the Greenbergs' business to collapse, which caused them severe emotional distress. Theodore was then compelled to move to Jerusalem to find work, while Moreen remained behind in Safed. The couple also experienced suffered severe psychological trauma as a result of the carnage and destruction that they witnessed. As a result of the Hizbollah Rocket Attacks the Greenbergs suffered severe psychological and emotional injuries. The *Kaplan* court found that the injuries suffered by Theodore and Moreen Greenberg entitle them to compensation in the amount of $2.5 million each. *Id*. at DE 65.

78.     In the summer of 2006, plaintiff Jared Sauter and his family lived in the town of Rosh Pina in the Galilee, where they had been for several happy years. Shortly after the start of the Hizbollah Rocket Attacks, with rockets raining down on Rosh Pina, Jared and his family fled for their lives in terror to another city. They remained in the home of a relative for the duration of

the attacks, but found it too traumatic and frightening to return to live in Rosh Pina. Jared was forced to relocate his family to a different city, and start over. As a result of the Hizbollah Rocket Attacks, and the trauma and disruption he experienced, Jared Sauter suffered severe psychological and emotional injuries. The *Kaplan* court found that the injuries suffered by Jared Sauter entitle him to compensation in the amount of $1.5 million. *Id.* at DE 65.

79.     In the summer of 2006, plaintiff Dvora Chana Kaszemacher was the proprietor of an art gallery in the city of Safed (a business that caters almost exclusively to tourists). She was also the wife of an elderly Holocaust survivor, and the mother of a daughter also living in Safed. The Hizbollah Rocket Attacks caused her severe anxiety and depression, which was exacerbated by her concerns about her husband and daughter. Additionally, the attacks resulted in a complete halt in tourism in northern Israel for several months during the peak tourism season, which in turn caused plaintiff Dvora Chana Kaszemacher severe financial damage. As a result of the Hizbollah Rocket Attacks, Dvora Chana Kaszemacher suffered severe psychological, emotional and financial injuries. The *Kaplan* court found that the injuries suffered by Dvora Chana Kaszemacher entitle her to compensation in the amount of $2,361,966.67. *Id.* at DE 65.

80.     On July 13, 2008, a rocket launched by Hizbollah landed a few meters away from plaintiff Chaya Kaszemacher Alkareif, in Safed causing her psychological and emotional damage. As a result of this rocket attack, and her experience of being in Safed throughout the Hizbollah Rocket Attacks, Chaya Kaszemacher Alkareif suffered severe psychological and emotional damage. The *Kaplan* court found that the injuries suffered by Chaya Kaszemacher Alkareif entitle her to compensation in the amount of $2.25 million. *Id.* at DE 65.

81.     Plaintiffs Avishai Reuvane and Elisheva Aron were living together in Safed in the summer of 2006. Several Hizbollah rockets fell on and severely damaged adjacent homes,

terrorizing them. On July 13, 2006, a rocket fired by Hizbollah struck their home and knocked Avishai unconscious. The couple then fled Safed. As a result of these experiences Avishai Reuvane and Elisheva Aron suffered severe physical, psychological and emotional injuries. The *Kaplan* court found that the injuries suffered by Avishai Reuvane and Elisheva Aron entitle each of them to compensation in the amount of $1.5 million. *Id*. at DE 65.

82.     On July 19, 2006 the art gallery owned by plaintiff Yair Mor in Safed was directly hit by a rocket launched by Hizbollah when he was on the premises. The business was completely destroyed. Rockets also fell near his home in nearby Rosh Pina, and Yair and his family were forced to flee the city for weeks. As a result of these events Yair Mor suffered severe psychological and emotional injuries. The *Kaplan* court found that the injuries suffered by Yair Mor entitle him to compensation in the amount of $850,000. *Id*. at DE 65.

83.     In the summer of 2006, Mikimi Steinberg was living in a rooftop apartment in Safed. When the Hizbollah Rocket Attacks began she was terrified that, given the position of her apartment, she could easily be killed. She therefore fled her apartment for the duration of the attacks. In her absence the apartment was indeed struck and severely damaged by a rocket. Many of her possessions were also destroyed. These experiences caused Mikimi Steinberg severe emotional and psychological injury. The *Kaplan* court found that the injuries suffered by Mikimi Steinberg entitle her to compensation in the amount of $850,000. *Id*. at DE 65.

### **Decedent's Murder and Plaintiffs' Injuries Are the Result of Defendants' Conduct**

84.     Terrorist organizations such as Hizbollah need banking services, including the ability to transfer funds through wire transfers, in order to operate, and in order to plan, to prepare for and to carry out terrorist attacks.

85.     Provision of wire transfer services and other banking services to Hizbollah enables Hizbollah to operate and to plan, to prepare for and to carry out terrorist attacks, and enhances Hizbollah's ability to plan, to prepare for and to carry out such attacks.

86.     Hizbollah carried out the Hizbollah Wire Transfers in order to transfer and receive funds necessary for planning, preparing and carrying out Hizbollah's terrorist activity, including rocket attacks on civilians generally and the Hizbollah Rocket Attacks specifically.

87.     The Hizbollah Wire Transfers carried out by LCB and Hamdoun, and the other banking services provided by LCB and Hamdoun to Hizbollah, substantially increased and facilitated Hizbollah's ability to plan, to prepare for and to carry out rocket attacks on civilians, including the Hizbollah Rocket Attacks.

88.     But for the Hizbollah Wire Transfers and other banking services provided by defendants to Hizbollah, Hizbollah's ability (a) to build and maintain its operational infrastructure for the planning and execution of the Hizbollah Rocket Attacks; (b) to pay, train, transport and shelter the terrorist operatives who carried out the Hizbollah Rocket Attacks; and (c) to carry out the Hizbollah Rocket Attacks, would have been severely crippled and limited.

89.     Hizbollah planned, made the preparations necessary for and carried out the Hizbollah Rocket Attacks utilizing funds received by Hizbollah as part of the Hizbollah Wire Transfers, and/or utilizing funds received by Hizbollah in exchange or consideration for the Hizbollah Wire Transfers, and/or utilizing funds that were freed up and/or otherwise made available to Hizbollah as a result of the Hizbollah Wire Transfers, and/or using funds drawn from a pool of funds created in part by the Hizbollah Wire Transfers.

90.     The funds received by Hizbollah as part of the Hizbollah Wire Transfers were sufficient to carry out the Hizbollah Rocket Attacks which killed the decedent and harmed the plaintiffs.

91.     The Hizbollah Wire Transfers were enabled, facilitated and carried out by and as the result of the conduct of defendants described herein.

92.     The Hizbollah Rocket Attacks were thereby enabled, facilitated, and proximately, legally, and in fact caused by the conduct of defendants described herein.

93.     Plaintiffs' injuries are therefore the direct, factual, legal, and proximate result of defendants' conduct.

**Defendants Knew or Should Have Known
That Their Conduct Would Result in Harm to the Plaintiffs**

94.     At all relevant times, including the period between 2004 and the present day, defendants had actual knowledge that, as discussed above, Hizbollah is a violent terrorist organization that had carried out numerous terrorist attacks against Israeli civilians and American targets and which planned and intended to carry out additional such terrorist attacks.

95.     At all relevant times, including the period between 2004 and the present day, defendants had actual knowledge that terrorist organizations such as Hizbollah require wire transfer services and other banking services in order to operate and in order to plan, prepare for and carry out terrorist attacks, and that providing wire transfer and other banking services to Hizbollah would enable Hizbollah to plan, to prepare for and to carry out terrorist attacks and/or enhance Hizbollah's ability to plan, prepare for and carry out such attacks, because such knowledge is notorious and known to banks and bankers, and even the public at large.

96.     At all relevant times, including the period between 2004 and the present day, defendants had actual knowledge that terrorist organizations such as Hizbollah require wire

Case 1:18-cv-12401-GBD-KHP   Document 65   Filed 05/06/22   Page 24 of 38

transfer and other banking services in order to operate and in order to plan, prepare for and carry out terrorist attacks, and that providing wire transfer and other banking services to Hizbollah would enable Hizbollah to plan, prepare for and carry out terrorist attacks and/or enhance Hizbollah's ability to plan, prepare for and carry out such attacks, because defendants were aware of the U.S. Sanctions Regime and that the U.S. Sanctions Regime is and was intended to prevent Hizbollah from conducting banking activities, including wire transfers, and thereby limit its ability to operate and to carry out terrorist attacks.

97.     At all relevant times, including the period between 2004 and the present day, defendants had actual knowledge that terrorist organizations such as Hizbollah require wire transfer and other banking services in order to operate and in order to plan, prepare for and carry out terrorist attacks, and that providing wire transfer and other banking services to Hizbollah would enable Hizbollah to plan, prepare for and carry out terrorist attacks and/or enhance Hizbollah's ability to plan, prepare for and carry out such attacks, because defendants were aware of the rules promulgated by the inter-governmental Financial Action Task Force ("FATF") and by the Middle East and North Africa Financial Action Task Force ("MENAFATF") (which Lebanon has adopted), requiring banks to know their customers, perform due diligence and not provide banking services to terrorist organizations, and that the FATF and MENAFATF rules are and were intended to prevent terrorist organizations such as Hizbollah from conducting banking activities, including wire transfers, and thereby limit their ability to operate and to carry out terrorist attacks.

98.     At all relevant times, including the period between 2004 and until July 12, 2006, defendants had actual knowledge that Shahid, Bayt al-Mal and Yousser were integral constituent parts of Hizbollah, that the Hizbollah Accounts and the funds therein were owned and controlled

by Hizbollah, and that the Hizbollah Wire Transfers were being carried out by and at the direction of Hizbollah.

99. At all relevant times, including the several year period prior to July 12, 2006, defendants had actual knowledge that Shahid, Bayt al-Mal and Yousser were integral constituent parts of Hizbollah, that the Hizbollah Accounts and the funds therein were owned and controlled by Hizbollah, and that the Hizbollah Wire Transfers were being carried out by and at the direction of Hizbollah, because the fact that Shahid, Bayt al-Mal and Yousser were integral constituent parts of Hizbollah was notorious public knowledge in Lebanon and elsewhere during the period between 2004 and until July 12, 2006.

100. The fact that Shahid, Bayt al-Mal and Yousser were integral constituent parts of Hizbollah was openly, publicly and repeatedly acknowledged and publicized by Hizbollah during the several year period prior July 12, 2006, *inter alia* on Hizbollah's official websites, in official press releases issued by Hizbollah, on Hizbollah's official television station, Al-Manar, on Hizbollah's official radio station, Al-Nour, and in numerous press conferences and news media interviews conducted by senior Hizbollah officials.

101. Additionally, the fact that Shahid is an integral constituent part of Hizbollah was repeatedly publicized for many years prior July 12, 2006, in various English-language publications, including without limitation the following:

      a) On October 8, 1991, The Independent newspaper (published in London) reported that the Martyrs Foundation (i.e. Shahid) supplies stipends to the families of Hizbollah terrorists. *See* Robert Fisk, *Testament of a doomed youth; In the home of a Hizbollah family in Beirut, hears how a father's death sent his son to 'martyrdom' in southern Lebanon*, The Independent, October 8, 1991.

b)      On May 30, 2000, The Irish Times published an article reporting that Hizbollah operatives, including personnel "from the Martyrs' Foundation," were moving into parts of Southern Lebanon. *See Hizbullah moves to consolidate its political gains in Lebanon,* The Irish Times, May 30, 2000.

c)      On November 27, 2001, BBC Worldwide Monitoring service published an English-language transcript of an article which appeared the same day in the Lebanese newspaper Al-Safir, regarding a Shahid event officiated over by Hizbollah Secretary-General Hasan Nasrallah. *See* BBC Worldwide Monitoring, *USA makes "big mistake" if it wages war in Mideast, says Hezbollah leader,* November 27, 2001.

d)      In January 2002, the Middle East Intelligence Bulletin (a joint publication of the United States Committee for a Free Lebanon and the Middle East Forum) published an article on its website reporting that Paraguayan authorities had found fundraising forms for Shahid in the possession of a senior Hizbollah operative. [10]

e)      On June 14, 2002, BBC Worldwide Monitoring service published an English-language translation of a June 8, 2002 article which appeared in the Arabic-language newspaper Al-Sharq al-Awsat (published in London and widely distributed throughout the Arabic-speaking world including Lebanon), which reported that "'Al-Shaheed' the Martyrs Foundation … give every month vast amounts of financial aid" to Hizbollah operatives. *See* BBC Worldwide Monitoring, *Iran reportedly agrees to increase Islamic Jihad's budget*, June 14, 2002.

---

[10] *See* Blanca Madani, *Hezbollah's Global Finance Network: The Triple Frontier*, available at https://web.archive.org/web/20020208133057/http://www.meib.org/articles/0201_l2.htm.

f)      An English-language article published by the wire service Agence France-Presse on September 2, 2002, reported that Paraguayan authorities had found receipts for the transfer of over $3.5 million to the "Martyr's Organization" (i.e. Shahid) in the possession of Hizbollah's leader in Latin America.

g)      On November 7, 2003, BBC Worldwide Monitoring service published an English-language transcript of a November 3, 2003 report on Al Manar (Hizbollah's TV station) of a Shahid event led by the Secretary-General of Hizbollah. *See BBC Worldwide Monitoring, Lebanese Hezbollah leader discusses Bush's speech, democracy in Mideast,* November 7, 2003.

h)      In July 2003, the Federal Research Division of the Library of Congress issued a report linking Shahid to Hizbollah. *See Terrorist and Organized Crime Groups in the Tri-Border Area (TBA) of South America,* available at https://irp.fas.org/cia/product/frd0703.pdf, at 72-75 (noting that the "'Martyr' Social Beneficent Organization … is linked to the Hizballah" and that Paraguayan authorities had found fundraising forms for Shahid in the possession of a senior Hizbollah operative).

i)      On December 30, 2004, Slate Magazine published an article about Hizbollah's television station, Al Manar, and which reported that "An Al-Manar public service message tells families of suicide bombers where to go to collect the subsidy from a martyrs' foundation." *See* Jack Shafer, *Who's Afraid of Hezbollah TV?*, Slate Magazine, December 30, 2004.

j)      In February 2005, counterterrorism expert Dr. Matthew Levitt published an article on the website of the Washington Institute for Near East Policy, which confirms that Shahid provides funds for Hizbollah terrorists. *See* Matthew Levitt, *Hizballah Finances:*

*Funding the Party of God*, available at: https://www.washingtoninstitute.org/policy-analysis/hezbollah-finances-funding-party-god.

k)      On March 1, 2005, a summary of Dr. Levitt's February 2005 article was published by the Washington Institute, which reiterates that Shahid "supplies charitable funds for Hizballah-affiliated suicide bombers." *See* Matthew Levitt, *Hizballah Finances: Funding the Party of God*, available at: https://www.washingtoninstitute.org/policy-analysis/hizballah-finances-funding-party-god.

l)      On March 28, 2005, the PR Newswire company (a news and information distribution service) distributed a press release issued by Fortress Global Investigations (a major private investigation and security firm operated by former FBI and CIA agents) confirming that Shahid is "a front organization for the terrorist organization, Hezbollah." This press release was published on numerous news and websites.

m)      An article published on May 1, 2005, in Infantry Magazine, reported that the role of the "Shaheed (martyrs) Foundation" is to fund and provide benefits "for the families of those dying for Hizballah's objectives. This includes maintaining a $2,500 stipend for families of suicide bombers and martyrs of Hizballah." Youssef Aboul-Enein, *Hizballah: a discussion of its early formation,* Infantry Magazine, May 1, 2005.

n)      On May 25, 2005, counterterrorism expert (and former FBI agent) Dr. Matthew Levitt appeared before the Senate Committee on Homeland Security and Governmental Affairs, and testified that Shahid "admittedly supplies charitable funds for the family of suicide bombers." *See Terrorists, Criminals and Counterfeit Goods*, CQ Congressional Testimony May 25, 2005.

o)      A complaint filed in the U.S. District Court for the Southern District of New York in November 2004 in the matter of *Ayyash v. Bank Al-Madina*, Civ. No. 04-9201 (S.D.N.Y.) stated that Shahid is a "front organization" for Hizbollah. *Id.,* DE 1 at ¶ 48.

p)      On March 9, 2006, the U.S. District Court for the Southern District of New York issued a decision in the *Ayyash* case, expressly noting that "'Al-Shaheed,' [is] a front organization for Hezbollah." *Ayyash v. Bank Al-Madina*, 2006 WL 587342 at *1 n. 1 (S.D.N.Y. March 9, 2006).

102.    All of the documents cited in the previous paragraph are and at all times were publicly available on the internet and/or on the Lexis-Nexis news archive.

103.    Furthermore, defendants knew that the Bayt al-Mal accounts were in fact Hizbollah accounts, because those accounts were opened by the head of Bayt al-Mal, who was none other than the notorious Hizbollah leader Husayn al-Shami. As the U.S. Treasury has accurately explained in 2006, Husayn al-Shami, was "a senior Hizballah leader who has served as a member of Hizballah's Shura Council and as the head of several Hizballah-controlled organizations, including the Islamic Resistance Support Organization."[11]

104.    The fact that defendants knew that when they dealt with Shahid, Bayt al-Mal and Yousser they were dealing with Hizbollah is also reflected in a Verified Amended Complaint, the accuracy of which was sworn to under penalty of perjury by Special Agent Christopher Miller of the U.S. Drug Enforcement Administration, filed by the U.S. Government in *U.S. v. Lebanese Canadian Bank, SAL*, Civ. No, 11-9186 (S.D.N.Y.). Paragraph 44(g) of that Verified Amended Complaint, which is incorporated herein by reference, details how beginning in 2003, LCB and

---

[11]    **Treasury Designation Targets Hizballah's Bank**, available at https://home.treasury.gov/news/press-releases/hp83.

Safa (defendant Hamdoun's direct subordinate and right-hand man) systematically granted a large number of well-known senior Hizbollah leaders and Hizbollah entities, including Shahid, Yousser and Bayt al-Mal, special exceptions from submitting cash transaction slips – which require disclosure of the source of funds and are filed with the Central Bank of Lebanon – for cash transactions over $10,000. In other words, LCB and Safa (pursuant to Hamdoun's authorization) actively assisted Hizbollah's leaders and subordinate entities, including Shahid, Yousser and Bayt al-Mal, to conduct cash banking activities without complying with reporting requirements, in order to avoid scrutiny or interference by Lebanese government authorities.

105.   Additionally, and/or alternatively, defendants should have known and had a duty to inform themselves that Shahid, Bayt al-Mal and Yousser were integral parts of Hizbollah because this fact was notorious public knowledge. If defendants failed to do so they were willfully blind.

106.   Additionally, and/or alternatively, defendants should have known and had a duty to inform itself that Shahid, Bayt al-Mal and Yousser were integral parts of Hizbollah because LCB had statutory duties, *inter alia* under United States law, under the laws of the State of New York, under Lebanese law, and under the rules promulgated by FATF and by MENAFATF, to know its customers, perform due diligence and not provide banking services to terrorist organizations such as Hizbollah. If defendants failed to do so they were willfully blind.

107.   By executing the Hizbollah Wire Transfers and providing Hizbollah with other banking services, LCB, with the approval and participation of Hamdoun, breached its statutory duties to know its customers and perform due diligence and not provide banking services to terrorist organizations such as Hizbollah.

108.   Additionally, and/or alternatively, defendants should have known and had a duty to inform themselves that Shahid, Bayt al-Mal and Yousser were integral parts of Hizbollah because

LCB had and has statutory duties, *inter alia* under U.S. law, under the laws of the State of New York, under Lebanese law, and under the rules promulgated by FATF and MENAFATF, to monitor, report and refuse to execute illegal, suspicious and/or irregular banking transactions. If defendants failed to do so they were willfully blind. The Hizbollah Wire Transfers and other banking activities carried out at LCB by Hizbollah were facially suspicious and irregular because they had no business or apparent lawful purpose, and there was no reasonable explanation for them.

109.    By executing the Hizbollah Wire Transfers and providing other banking services to Hizbollah, LCB, with the approval and participation of Hamdoun, breached its statutory duties to monitor, report and refuse to execute suspicious and/or irregular banking transactions.

**Defendants Intended That Their Conduct Would Result in Harm to the Plaintiffs**

110.    The Republic of Lebanon and the State of Israel have had hostile relations since 1948.

111.    Anti-Israeli sentiment, and support for Hizbollah and its anti-Israel program, goals and activities, is very widespread in Lebanese society.

112.    Since the 1980s, Hizbollah is and has been a major and popular political organization in Lebanon.

113.    At all relevant times, Hizbollah held a large number of seats in the Lebanese parliament, was part of the Lebanese central government and held seats in numerous municipal governments throughout Lebanon.

114.    At all relevant times, Hizbollah enjoyed and enjoys extensive support in the Lebanese public.

115.    At all relevant times, including the period between 2004 and the present day, as a matter of official LCB policy and practice, authorized and implemented by Hamdoun, LCB continuously supported Hizbollah and its anti-Israel program, goals and activities.

116.    Specifically, at all relevant times, including the period between 2004 and the present day, as a matter of official LCB policy and practice, authorized and implemented by Hamdoun, LCB supports and supported Hizbollah's terrorist activities against Jews in Israel, and Hizbollah's goal of using terrorism to destroy the State of Israel and murder or expel its Jewish inhabitants.

117.    Additionally, at all relevant times, including the period between 2004 and the present day, as a matter of official LCB policy and practice, authorized and implemented by Hamdoun, LCB supports and supported Hizbollah's terrorist activities against Jews in Israel, and Hizbollah's goal of using terrorism to coerce, intimidate and influence the Israeli government and public.

118.    At all relevant times, including the period between 2004 and the present day, defendant LCB and Hamdoun carried out the Hizbollah Wire Transfers and provided Hizbollah with other banking services as a matter of official LCB policy and practice, in order to assist and advance Hizbollah's terrorist activities against Jews in Israel, in order to assist and advance Hizbollah's goal of using terrorism to destroy the State of Israel and murder or expel its Jewish inhabitants and in order to assist and advance Hizbollah's goal of coercing, intimidating and influencing the Israeli government and public.

119.    Defendants' aforementioned long-standing official policy and practice of support for Hizbollah's activities and goals (pursuant to which they carried out the Hizbollah Wire Transfers and provided Hizbollah other banking services), are also reflected in the following facts,

set forth in the Verified Amended Complaint in *U.S. v. Lebanese Canadian Bank, SAL*, Civ. No, 11-9186 (S.D.N.Y.), incorporated herein by reference:

      a)      In response to a 2002 UN report about a Hizbollah-linked money-laundering gang with which LCB had a banking relationship, LCB stated that "***we consider such allegation as part of the propaganda and war launched by the Jewish state against Lebanon***" and not only refused to end the relationship, but instead authorized an ***increase*** in credit limits for the Hizbollah gang.

      b)      Even *after* Yousser was designated by the U.S Treasury as a Specially Designated Global Terrorist, because of its role as "Hizballah's unofficial treasury," LCB continued to maintain a banking relationship with Yousser, with the authorization and participation of Hamdoun.

      c)      Beginning prior to the Hizbollah Rocket Attacks and until early 2011, LCB and Hamdoun knowingly assisted Hizbollah to launder hundreds of millions of dollars through a complex international scheme, as set forth in detail in the Verified Amended Complaint, and in an official Finding issued on February 10, 2011, by the U.S. Department of Treasury's Financial Crimes Enforcement Network ("FinCEN"). That Treasury Finding, incorporated herein by reference, states that the United States Government "has information indicating that a minority owner of the bank, who concurrently serves as General Manager, his deputy" – *i.e.*, **defendant Hamdoun** – "and the managers of key branches are **in frequent – in some cases even daily – communication with the various members of**" the Hizbollah scheme and that "**they personally process transactions on the network's behalf**." (emphasis added).

120.    Ultimately, the defendants' loyal and consistent dedication to Hizbollah and its terroristic goals led to LCB's demise as an active bank. In February 2011, the U.S. Treasury designated LCB as a "primary money laundering concern" due to its extensive involvement with and support for Hezbollah. 76 Fed. Reg. 9403, Feb. 17, 2011. And in December 2011, the United States brought a forfeiture action against LCB in this Court, due to its wide-ranging Hezbollah-related activities dating back at least to 2002. *U.S. v. Lebanese Canadian Bank, SAL*, 11-cv-9186 (S.D.N.Y.).

**FIRST CLAIM FOR RELIEF**
**AGAINST LCB ON BEHALF OF THE LELCHOOKS, MALKA KUMER,**
**CHANA LIBA KUMER AND MIRIAM ALMACKIES**
**AIDING AND ABETTING PURSUANT TO 18 U.S.C. § 2333(d)**

121.    The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

122.    As required by 18 U.S.C. § 2331, the Hizbollah Rocket Attacks constituted a violation of the criminal laws of the United States and of every State, and/or would be a criminal violation if committed within the jurisdiction of the United States or of any State.

123.    As required by 18 U.S.C. § 2331, the Hizbollah Rocket Attacks were violent acts and acts dangerous to human life.

124.    As required by 18 U.S.C. § 2331, the Hizbollah Rocket Attacks appeared to be, and were, "intended ... to intimidate or coerce a civilian population [or] to influence the policy of a government by intimidation or coercion," since their purpose was to (a) intimidate and influence the Israeli government and public and thereby weaken, harm and undermine Israel militarily, economically and politically and (b) intimidate and influence the Israeli government and public and thereby bring about the eventual eradication of the State of Israel and its replacement with an Islamic state and the murder and/or expulsion of the Jewish residents of the State of Israel.

125.    As required by 18 U.S.C. § 2331, the Hizbollah Rocket Attacks transcended national boundaries in terms of the means by which they were accomplished and the persons they appeared intended to intimidate or coerce.

126.    Therefore, the Hizbollah Rocket Attacks constituted "acts of international terrorism" as defined in 18 U.S.C. § 2331.

127.    Hizbollah committed, planned, and authorized the Hizbollah Rocket Attacks.

128.    Hizbollah was designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. § 1189), as of the date on which it committed, planned, and authorized the Hizbollah Rocket Attacks.

129.    Hizbollah is a "person" within the meaning of 18 U.S.C. § 2333(d)(1).

130.    LCB knowingly aided and abetted Hizbollah to commit the Hizbollah Rocket Attacks, by providing substantial assistance to Hizbollah. Specifically, LCB provided Hizbollah with extensive banking services which it knew would enable, facilitate, support and assist Hizbollah to carry out the acts of terrorism which killed the decedent and harmed the plaintiffs.

131.    LCB is therefore liable as an aider and abettor for all of the damages due to the plaintiffs, in such sums as may hereinafter be determined, to be trebled pursuant to 18 U.S.C. § 2333(a).

## SECOND CLAIM FOR RELIEF
## AGAINST HAMDOUN ON BEHALF OF ALL PLAINTIFFS
## AIDING AND ABETTING PURSUANT TO 18 U.S.C. § 2333(d)

132.    The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

133.    As required by 18 U.S.C. § 2331, the Hizbollah Rocket Attacks constituted a violation of the criminal laws of the United States and of every State, and/or would be a criminal violation if committed within the jurisdiction of the United States or of any State.

134.    As required by 18 U.S.C. § 2331, the Hizbollah Rocket Attacks were violent acts and acts dangerous to human life.

135.    As required by 18 U.S.C. § 2331, the Hizbollah Rocket Attacks appeared to be, and were, "intended ... to intimidate or coerce a civilian population [or] to influence the policy of a government by intimidation or coercion," since their purpose was to (a) intimidate and influence the Israeli government and public and thereby weaken, harm and undermine Israel militarily, economically and politically and (b) intimidate and influence the Israeli government and public and thereby bring about the eventual eradication of the State of Israel and its replacement with an Islamic state and the murder and/or expulsion of the Jewish residents of the State of Israel.

136.    As required by 18 U.S.C. § 2331, the Hizbollah Rocket Attacks transcended national boundaries in terms of the means by which they were accomplished and the persons they appeared intended to intimidate or coerce.

137.    Therefore, the Hizbollah Rocket Attacks constituted "acts of international terrorism" as defined in 18 U.S.C. § 2331.

138.    Hizbollah committed, planned, and authorized the Hizbollah Rocket Attacks.

139.    Hizbollah was designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. § 1189), as of the date on which it committed, planned, and authorized the Hizbollah Rocket Attacks.

140.    Hizbollah is a "person" within the meaning of 18 U.S.C. § 2333(d)(1).

141.     Hamdoun knowingly aided and abetted Hizbollah to commit the Hizbollah Rocket Attacks, by providing substantial assistance to Hizbollah. Specifically, Hamdoun provided Hizbollah with extensive banking services which he knew would enable, facilitate, support and assist Hizbollah to carry out the acts of terrorism which killed the decedent and harmed the plaintiffs.

142.     Hamdoun is therefore liable as an aider and abettor for all of the damages due to the plaintiffs, in such sums as may hereinafter be determined, to be trebled pursuant to 18 U.S.C. § 2333(a).

**WHEREFORE**, the Plaintiffs demand Judgment against Defendants, jointly and severally, as follows:

(a)   For compensatory damages in an amount to be determined at trial but no less than $350,000,000.00, to be trebled pursuant to 18 U.S.C. § 2333(a).

(b)   For costs and attorneys' fees.

(c)   For such other and further relief as justice requires.

The plaintiffs demand a jury trial on all matters so triable.

Dated:   Brooklyn, New York
         May 6, 2022

                         Yours,

                         THE BERKMAN LAW OFFICE, LLC
                         *Attorneys for the plaintiffs*


                         by: _____
                              Robert J. Tolchin

                         111 Livingston Street, Suite 1928
                         Brooklyn, New York 11201
                         (718) 855-3627