UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- x
ESTER LELCHOOK, *individually and as personal representative of the Estate of David Martin Lelchook*, MICHAL LELCHOOK, YAEL LELCHOOK, ALEXANDER LELCHOOK, *individually and as personal representative of the Estate of Doris Lelchook*, DORIS LELCHOOK, MALKA KUMER, CHANA LIBA KUMER, MIRIAM ALMACKIES, CHAIM KAPLAN, RIVKA KAPLAN, BRIAN ERDSTEIN, KARENE ERDSTEIN, MA'AYAN ERDSTEIN, CHAYIM KUMER, NECHAMA KUMER, LAURIE RAPPEPPORT, MARGALIT RAPPEPORT, THEODORE (TED) GREENBERG, MOREEN GREENBERG, JARED SAUTER, DVORA CHANA KASZEMACHER, CHAYA KASZEMACHER ALKAREIF, AVISHAI REUVANE, ELISHEVA ARON, YAIR MOR, and MIKIMI STEINBERG,

                Plaintiffs,

  -against-

LEBANESE CANADIAN BANK, SAL and MOHAMED HAMDOUN,

                Defendants.
------------------------------------- x

MEMORANDUM DECISION
AND ORDER

18 Civ. 12401 (GBD) (KHP)

GEORGE B. DANIELS, District Judge:

    Plaintiffs allege that they were injured by rocket attacks perpetrated by the Lebanese Islamist political group, Hizbollah, in July and August 2006 and July 2008. Plaintiffs brought this action under the Anti-Terrorism Act, 18 U.S.C. § 2333 (the "ATA"), as amended by the Justice Against State Sponsors of Terrorism Act, Pub. L. 114-222, 120 Stat. 82 (2016) ("JASTA"), against Lebanese Canadian Bank, SAL ("LCB") and its former Deputy General Manager Mohamed Hamdoun ("Hamdoun," together with LCB, "Defendants") for facilitating these attacks by providing banking services to Hizbollah through Hizbollah's affiliates. (First Am. Compl. ("FAC"), ECF No. 65, ¶ 3.)

1

Hamdoun moves to dismiss Plaintiffs' complaint for lack of personal jurisdiction and failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6), respectively, and Defendants collectively move to dismiss the individual claims of Plaintiff Ester Lelchook for lack of statutory standing. (Notice of Mot. to Dismiss Am. Compl., ECF No. 75.) Hamdoun's motion to dismiss on Rules 12(b)(2) and 12(b)(6) grounds is DENIED. Defendants' motion to dismiss Esther Lelchook's individual claims for lack of statutory standing is GRANTED.

## I.   FACTUAL BACKGROUND

This action arises out of a series of rocket attacks carried out by Hizbollah in Israel between July 12 and August 14, 2006 and on July 13, 2008 (the "Rocket Attacks"). (FAC ¶¶ 63, 80.) Except for Ester Lelchook, a non-American citizen, Plaintiffs are American citizens (and an estate) who suffered injuries as a result of the Rocket Attacks, including physical, psychological, and emotional injuries, property damage, and lost income. (Id. ¶¶ 64–83.) Plaintiffs allege that LCB, a now-defunct Lebanese bank, and individual defendant Hamdoun "intentionally and/or recklessly provided [to Hizbollah] extensive banking services" that "caused, enabled and facilitated" the Rocket Attacks. (Id. ¶ 3, 11.)

Plaintiffs allege that from at least 2004 through July 2006, LCB maintained bank accounts for Hizbollah under the names of two Hizbollah leaders, Husayn al-Shami and Wahid Mahmoud Sbeity, and three "subordinate entities" created and wholly controlled by Hizbollah (collectively, the "Customers"). (Id. ¶¶ 29, 31, 45, 46.) The "subordinate entities" are the Shahid (Martyrs) Foundation ("Shahid"), which allegedly provides "financial and other material support to Hizbollah terrorists wounded in action, and to the families of Hizbollah terrorists killed in action"; Bayt al-Mal, which allegedly functions as Hizbollah's "main financial body"; and the Yousser Company for Finance and Investment ("Yousser"), which, together with Bayt al-Mal, allegedly

function as Hizbollah's "unofficial treasury." (*Id.* ¶¶ 29–32.) Plaintiffs allege that at "all times," the Customers' accounts[1] and funds therein belonged to and were under the control of Hizbollah, and that all transactions processed through the Customers' accounts were "carried out by" and "at the direction of" Hizbollah. (*Id.* ¶¶ 49–51.)

Plaintiffs further allege that between 2004 and July 2006, Hizbollah made and received wire transfers totaling millions of dollars through these accounts. (*Id.* ¶ 53.) According to Plaintiffs, Hizbollah conducted wire transfers through the Customers' accounts that LCB maintained "in order to transfer and receive funds necessary for planning, preparing and carrying out Hizbollah's terrorist activity," including the Rocket Attacks. (*Id.* ¶ 86.) Plaintiffs allege that Hizbollah perpetrated the attacks using funds received through the wire transfers and that these funds "substantially increased and facilitated Hizbollah's ability" to carry out the attacks. (*Id.* ¶ 87.) To effectuate transfers of funds in U.S. currency, LCB tapped American Express Bank Ltd. in New York to serve "as a correspondent bank for LCB" who "carried out LCB's U.S. dollar transactions." (*Id.* ¶ 43.)

Plaintiffs allege that but for LCB's provision of wire transfer and other banking services to Hizbollah, Hizbollah's ability to carry out the attacks would have been "severely crippled and limited." (*Id.* ¶ 88.) Supplying such support was allegedly an "official LCB policy and practice" carried out with the purpose of assisting "Hizbollah's terrorist activities against Jews in Israel" and

---

[1] Plaintiffs list in the FAC account numbers for bank accounts "Hizbollah continuously maintained" through the Customers for the relevant time period, including five bank accounts "titled to Shahid"; two accounts "nominally listed in the names of" Bayt al-Mal, Husayn al-Shami, and Wahid Mahmoud Sbeity; and five bank accounts under Yousser. (FAC ¶¶ 45–47.)

3

served to further "Hizbollah's goal of using terrorism to coerce, intimidate and influence the Israeli government and public." (*Id.* ¶ 117.)

Defendant Hamdoun is alleged to be a principal actor behind LCB's provision of these banking services, "personally initiat[ing] and authoriz[ing] LCB's banking relationship with Hizbollah, including the opening and maintenance of the Hizbollah Accounts, and the processing of the Hizbollah Wire Transfers." (*Id.* ¶¶ 59–60.) Plaintiffs allege that Hamdoun "also operated through his direct subordinate, Ahmad Safa, who was the Associate General Manager for Branches and Operations in LCB." (*Id.* ¶ 61.) Safa allegedly "opened the [Customer's] [a]ccounts and managed them on a day-to-day basis in collaboration with Hizbollah" and executed the wire transfers "pursuant to the direction and authorization of Hamdoun." (*Id.* ¶ 62.)

## II.   **PROCEDURAL HISTORY**

Plaintiffs filed their original complaint in this action on December 31, 2018. (Compl., ECF No. 1.) Defendants later agreed to waive service in a stipulation filed months later on April 15, 2019, which this Court so ordered the following day. (*See* Proposed Stipulation and Order, ECF No. 29, ¶ 1; Stipulation and Order, ECF No. 32.) This stipulation included a provision "waiv[ing] service of process in exchange for Plaintiff's agreement to . . . stay proceedings, and to adjourn [Defendants'] time to respond to the [original] [c]omplaint." (Stipulation and Order, ECF No. 32.) It expressly preserved Defendants' right to raise all defenses, including a Rule 12(b)(2) defense, i.e., a lack of personal jurisdiction defense. (*See* Stipulation and Order, ECF No. 32, ¶ 3.) On November 8, 2021, this Court so ordered the parties' next stipulation, which provided a November 29 deadline for Defendants to file a motion to dismiss and an agreement that the parties would submit a proposed briefing schedule to this Court within a week thereof. (Stipulation and Order, ECF No. 37.)

4

Defendants then timely filed their first motion to dismiss on November 29, 2021, seeking dismissal of Plaintiffs' original complaint for lack of subject matter jurisdiction and a failure to state a claim pursuant to Rules 12(b)(1) and 12(b)(6), respectively. (*See* Notice of Mot. to Dismiss, ECF No. 40.) Notably absent from that first motion to dismiss (and its supporting papers) was a Rule 12(b)(2) motion for lack of personal jurisdiction.

The parties entered into another stipulation on February 24, 2022, so ordered on February 28, and agreed that, pursuant to Rule 15(a)(2), Plaintiffs were to file a first amended complaint on or before May 6, 2022. (Proposed Stipulation and Order, ECF No. 58, ¶ 1; Stipulation and Order, ECF 59.) Plaintiffs filed the FAC on that date, and this Court denied as moot Defendants' motion to dismiss the earlier filed complaint. (FAC; Order, ECF No. 69.)

Defendants filed the instant motion to dismiss, their second, on July 13, 2022, with Hamdoun asserting for the first time Rule 12(b)(2) lack of personal jurisdiction as an additional basis for dismissal even though he failed to do so in his first motion to dismiss. (*Compare* Notice of Mot. to Dismiss, ECF No. 40 *with* Notice of Mot. to Dismiss, ECF No. 77.)

### III. <u>HAMDOUN'S MOTION TO DISMISS IS DENIED</u>

Hamdoun waived his right to raise a motion to dismiss for lack of personal jurisdiction by failing to include a 12(b)(2) defense in his first Rule 12 motion. Additionally, Plaintiffs' well-pleaded factual allegations plausibly state a claim for relief against Hamdoun under JASTA.

#### A. Hamdoun Waived His Defense of Lack of Personal Jurisdiction

Hamdoun moves to dismiss the counts against him for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). (*See* Mem. of Law in Supp. Of Defs.' Mot. to Dismiss Pls.' First Am. Compl. ("Defs.' Mem."), ECF No. 78, at 9–14.) In response, Plaintiffs submit that Hamdoun has waived the defense of personal jurisdiction because he neglected to assert it in his first

5

motion to dismiss. (Pl.'s Mem. of Law in Opp'n to Mot. to Dismiss, ("Pls.' Opp."), ECF No. 90, at 2–5.)

Federal Rule of Civil Procedure 12(g)(2) provides that, "[e]xcept as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." The objective of Rule 12(g) is to eliminate unnecessary delay at the pleadings stage and prevent dilatory motion practice. *FRA S. p. A. v. Surg-O-Flex of Am., Inc.*, 415 F. Supp. 421, 427 (S.D.N.Y. 1976). Indeed, "the message conveyed by the present version of Rule 12[] seems quite clear"; "[i]t advises a litigant to exercise great diligence in challenging personal jurisdiction, venue, or service of process. If that party wishes to raise any of these defenses, that must be done at the time the first significant defensive move is made—whether it be by way of a Rule 12 motion or a responsive pleading." 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1391, at 512 (3d ed. 2004) (collecting cases).

Notwithstanding his failure to assert the defense in his first Rule 12 motion, Hamdoun argues that his instant motion should be considered timely because Plaintiffs later amended their complaint, which Hamdoun asserts revived his right to make a Rule 12(b) motion. (*See* Defs.' Mem. at 12–14.) This argument fails in light of *Gilmore v. Shearson/American Express, Inc.*, 811 F.2d 108, 112 (2d Cir. 1987), *overruled on other grounds by Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271 (1988), which clearly articulated that the defense of personal jurisdiction "may not be resurrected merely because a plaintiff has amended the complaint."[2] *Id.* (citations omitted).

---

[2] The cases Hamdoun cites in support of a finding of no waiver are unanalogous. In *Huang v. Kim Dang Nguyen*, No. 19 Civ. 3309, 2020 WL 9812921, at *2 n. 6 (E.D.N.Y. Feb. 11, 2020), special solicitude was afforded the Defendant due to his *pro se* status. The defendants in *Boss Prod. Corp. v. Tapco Int'l Corp.*, No. 00 Civ. 0689, 2001 WL 135819, at *1 (W.D.N.Y. Feb. 16, 2001) and *Phat Fashions, L.L.C. v. Phat Game Athletic Apparel, Inc.*, No. 00 Civ. 0201, 2001 WL 1041990, at *3 (S.D.N.Y. Sept. 7, 2001) did contest the assertion of personal jurisdiction in their answers, just not using the proper terminology. Both

Hamdoun maintains that he expressed an "intent to assert a personal jurisdiction defense" in the stipulation in which he accepted service, thereby reserving his right to file a Rule12(b)(2) motion. (Reply Mem. of Law in Supp. Of Defs.' Mot. to Dismiss Pls.' First Am. Compl. ("Defs.' Reply"), ECF No. 95, at 6–7). However, the stipulation merely ensured that Hamdoun did not waive a personal jurisdiction defense by accepting service. (Order and Stipulation, ECF No. 32 ¶ 3 ("*In filing this Stipulation and Order*, LCB and Mr. Hamdoun do not waive, and instead expressly preserve, all . . . defenses set forth in Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure . . . .") (emphasis added).) Consequently, he was still required to raise his personal jurisdiction defense in his "first significant defensive move," which was his first motion to dismiss, filed *after* the stipulation. Wright & Miller at 512. Hamdoun makes no effort to explain his failure to assert the defense in his first motion after specifically reserving the right to do so. Indeed, the stipulation's timing puts Hamdoun's omission on worse footing, as it appears that the omission was a deliberate, strategic choice to forgo a Rule 12(b)(2) defense. In any event, even if the stipulation intended to reserve Hamdoun's right to file a personal jurisdiction defense after his first defensive move, Hamdoun cites no support for a litigant's ability to stipulate around Rule 12's well-established waiver provisions.

By failing to object to this Court's exercise of personal jurisdiction in his first Rule 12 motion, Hamdoun waived this defense. Plaintiffs' subsequent filing of an amended complaint did not revive it. Hamdoun's motion to dismiss for lack of personal jurisdiction is therefore denied.

---

courts accordingly found no forfeiture, as to hold otherwise "would elevate form over substance." *See e.g.*, *Boss Prod. Corp*, 2001 WL 135819, at *1.

### B. Hamdoun's Motion To Dismiss For Failure To State A Claim Is Denied

#### 1. Legal Standard

Hamdoun argues that Plaintiffs have failed to state a valid claim against him for aiding and abetting under JASTA. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citation omitted). A facially plausible claim, in turn, requires the plaintiff to plead facts that enable the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). The factual allegations pleaded must therefore "be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted).

A district court first reviews a plaintiff's complaint to identify allegations that "are not entitled to the assumption of truth" "because they are no more than conclusions . . . ." *Iqbal*, 556 U.S. at 679. The court then analyzes whether the remaining well-pleaded factual allegations, assumed to be true, "plausibly give rise to an entitlement to relief." *Id.*; *see also Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020) (citation omitted). In deciding a 12(b)(6) motion, the court must also draw all reasonable inferences in the non-moving party's favor. *See N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 120 (2d Cir. 2013).

To prevail on a JASTA claim in particular, a plaintiff must satisfy the three *Halberstam* elements: (1) "the party whom the defendant aids must perform a wrongful act that causes an injury," (2) "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance," and (3) "the defendant must knowingly

and substantially assist the principal violation." *Twitter, Inc. v. Taamneh*, 143 S. Ct. 1206, 1219 (2023) (quoting *Halberstam v. Welch*, 705 F.2d 472, 227 U.S. App. D.C. 167 (D.C. Cir. 1983)).

Plaintiffs' allegations as to LCB have already survived a JASTA-related Rule 12(b)(6) motion. In a parallel case with substantively identical allegations, the plaintiffs alleged JASTA liability against LCB (but not Hamdoun). This Court concluded that the allegations pled were not sufficiently plausible to survive LCB's motion to dismiss. *Kaplan v. Lebanese Canadian Bank, SAL*, 405 F.Supp.3d 525, 528 (2019). Of the three *Halberstam* elements, this Court ruled that the plaintiffs failed to adequately allege the general awareness and substantial assistance elements. *Id.* at 534. The plaintiffs appealed that decision. On appeal, the Second Circuit disagreed with this Court's determination and reversed that decision, concluding that the plaintiffs plausibly alleged both elements. *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 863 (2d Cir. 2021).

The Second Circuit Court of Appeals credited the following core allegations as sufficient to satisfy the general awareness element: (1) Hizbollah's—as a designated FTO since 1997—repeated, public acknowledgment of carrying out terrorist attacks against civilians, (2) Hizbollah's repeated, public acknowledgment that Bayt al-Mal, Shahid, and Yousser "were integral constituent parts of Hizbollah," and (3) "LCB's provision to [those] Hizbollah affiliates, beginning no later than 2003, of banking services that permitted the laundering of money . . . ." 999 F.3d at 864–65 (cleaned up). In short, the plaintiffs fulfilled this element because they "plausibly allege[d] the . . . Customers were so closely intertwined with Hizbollah's violent terrorist activities that one can reasonably infer that LCB was generally aware while it was providing banking services to those entities that it was playing a role in unlawful activities . . . ." *Id.* at 860–61.

As for knowing and substantial assistance, the *Kaplan* court on appeal highlighted the following in concluding that the plaintiffs' allegations were sufficiently plausible:

9

the U.N. reported in 2002 that an LCB customer was engaged in money laundering for Hizbollah; that LCB responded to that report by asserting that the report was Israeli propaganda as part of a "war by the Jewish state against Lebanon"; that LCB increased the permissible amount of activity that the U.N. had found constituted money laundering; and that in the following year, LCB began allowing the [] Customers—which Hizbollah repeatedly and public[ly] said were integral parts of Hizbollah—to conceal their sources of deposited funds totaling nearly half a million dollars per day (SAC ¶¶ 82, 97(a); U.S. Verified Complaint ¶¶ 47(f) and (g)). . . . [G]iven that LCB's special treatment of the Customers allowed them to deposit large sums in various accounts at different LCB branches—totaling more than $2.5 million dollars a week (see U.S. Verified Complaint ¶¶ 47(g)(1)-(4), (7))—without disclosing their source, thereby circumventing sanctions imposed in order to hinder terrorist activity, the SAC adequately pleaded that LCB knowingly gave the Customers assistance that both aided Hizbollah and was qualitatively and quantitatively substantial.

*Id.* at 866.

Plaintiffs bring these same allegations in the FAC and assert additional allegations that Hamdoun played a significant role in LCB's money-laundering conduct. Faced with the *Kaplan* court's decision, Hamdoun seeks dismissal of Plaintiffs' JASTA claim not on *Halberstam* grounds, but rather by attacking the FAC for a purported failure to allege facts plausibly tying him to LCB's conduct. (*See* Defs.' Mem. at 14.)

Hamdoun invokes New York corporate law as the appropriate lens through which this issue should be viewed, claiming that, as an executive of LCB, a "corporate executive or officer may be held individually liable for torts that were allegedly committed by the executive's company *only if the executive participated in or directly oversaw* the allegedly tortious conduct." (*Id.* at 15 (quoting *Trisvan v. Heyman*, 305 F. Supp. 3d 381, 407 n.24 (E.D.N.Y. 2018).) Plaintiffs offer a less stringent formulation often found in cases brought under the FTC Act, where liability is imposed on individual defendants "for corporate acts or practices if they (1) participated in the acts or had authority to control the corporate defendant and (2) knew of the acts or practices." (Pls.' Opp. at 6 (quoting *F.T.C. v. Med. Billers Network*, 543 F. Supp. 2d 283, 320 (S.D.N.Y. 2008).)

Plaintiffs' offering is an inapplicable, niche framework used in actions brought by the Federal Trade Commission under the Federal Trade Commission Act. *See, e.g., F.T.C. v. Moses*, 913 F.3d 297, 306–07 (2d Cir. 2019); *F.T.C. v. LeadClick Media, LLC*, 838 F.3d 158, 169 (2d Cir. 2016) (quoting *F.T.C. v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989)). As properly viewed, Hamdoun's framework and the cases to which it applies are persuasive. To hold otherwise may result in adding an unnecessary layer of analysis to *Halberstam*'s aiding-and-abetting framework, potentially running afoul of both Congress's intent "to provide civil litigants with the broadest possible basis . . . to seek relief" and directive to apply the *Halberstam* framework. *See* JASTA, Pub. L. No. 114-222, § 2(b), 130 Stat. 852, 853 ("Purpose"); *see also Twitter, Inc.*, 143 S. Ct. at 1218.

Accordingly, the plausibility standard ordinary to Rule 12(b)(6) motions is the applicable standard. Thus, the specific question before this Court is, while drawing from its "judicial experience and common sense," *Iqbal*, 556 U.S. at 679, whether Plaintiffs have pleaded sufficient factual content plausibly tying Hamdoun to LCB's illicit banking services.

### 2. Plaintiffs Have Plausibly Alleged Hamdoun's Involvement in LCB's Money-Laundering Services

As a preliminary matter, Plaintiffs incorporate into the FAC by reference (1) a verified amended complaint filed in 2011 by the United States against LCB in a civil forfeiture action for its illegal activities related to Hizbollah, see *United States v. Lebanese Canadian Bank, SAL*, Civ. No. 11-9186 (PAE) (S.D.N.Y.) ("U.S. Verified Complaint"), and (2) a finding from the U.S. Department of Treasury's Financial Crimes Enforcement Network also from 2011, Notice 33, 76 Fed. Reg. 9403 (Feb. 17, 2011) (the "Treasure Finding"), describing, among other things, LCB's

improper provision of banking services to individuals and entities related Hizbollah. (FAC ¶¶ 119, 119(c).)³

The U.S. Verified Complaint outlines LCB's role in "a scheme to launder money through the United States financial system and the United States used car market." U.S. Verified Complaint ¶ 1. The scheme entailed the commingling of proceeds from narcotics trafficking and other crimes with proceeds from used car sales effectuated in the United States, which Hizbollah and other criminal beneficiaries laundered through accounts maintained with LCB. *Id.* ¶¶ 1–6. Indeed, "Hizballah members and supporters [were] involved at various points in the money laundering scheme," helping to smuggle "cash, including proceeds from the sale of used cars exported from the United States and narcotics proceeds, from West Africa to Lebanon; and finance[d] and facilitate[d] the purchase of some of the used cars in the United States." *Id.* ¶ 2.

The U.S. Verified Complaint implicates Ahmad Safa, a bank officer, in a detailed fashion. It charges Safa with granting exceptions to daily and weekly cash-reporting requirements to entities and individuals associated with Hizbollah, including Yousser and Shahid. *Id.* ¶¶ 47(g), 47(g)(4), 47(g)(7). As a means to combat money laundering, LCB required cash transaction slips ("CTS") for transactions exceeding $10,000, which provided "disclosure of the source of funds deposited and were filed with the Central Bank of Lebanon." *Id.* ¶ 47(g). "In or about September 2003, Ahmad Safa, the Associate General Manager for Branches and Operations, granted exceptions for certain LCB clients from LCB's policy of requiring cash transaction slips ('CTS') for cash transactions greater than $10,000." *Id* ¶ 47(g). Safa provided Yousser, its subsidiary, and

---

³ A complaint "is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Green v. Dep't of Educ. of N.Y.*, 16 F.4th 1070, 1077 (2d Cir. 2021) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (internal quotation marks omitted). Plaintiffs expressly incorporated the U.S. Verified Complaint and Treasury Finding into the FAC in Paragraphs 119 and 119(c), respectively.

its owners and directors exemptions from executing CTSs for transaction amounts far exceeding the $10,000 limit: up to $80,000 and 50,000,000 Lebanese pounds ($33,000) per week at a specific LCB branch and up to $260,000 and 200,000,000 Lebanese pounds ($132,000) per day at another branch. *See id.* ¶¶ 47(g)(4). He did the same for Shahid, exempting it from signing CTSs for cash transactions up to $100,000 per day. *Id.* ¶ 47(g)(7). All told, these exemptions exceeded $2.5 million a week.

In describing how LCB "knowingly conducted business with Hizballah-controlled entities," (*id.* ¶ 47), the U.S. Verified Complaint illuminates Hamdoun's connection to a Hizbollah-controlled entity—as the brother-in-law of a part owner of such an entity—with which LCB maintained a banking relationship:

> LCB maintained a banking relationship with Rayan (Offshore) LLC. Rayan was owned by, among others, Colonel Rida el-Moussaoui, the brother-in-law of LCB Executive Board Member and Deputy General Manager Mohammed Hamdoun and a former officer in the Lebanese security forces; and Nawaf Moussaoui, a Hizballah public spokesperson and presently a member of the Lebanese Parliament for the Loyalty to the Resistance Bloc, Hizballah's political party.

*Id.* at 47(d).

With respect to the Treasury Finding, Plaintiffs derive their most critical, non-conclusory allegations from this source. The Treasury Finding also describes LCB's role in the Hizbollah-affiliated used car scheme discussed in the U.S. Verified Complaint. As contained in the Treasury Finding, Plaintiffs allege that Hamdoun was "in frequent – in some cases even daily – communication" with various participants of the criminal network, including Hizbollah, that trafficked narcotics and laundered hundreds of millions of dollars as part of the used car scheme. (FAC ¶ 119(c); Treasury Finding at 9405–06.) Plaintiffs further allege that, pursuant to these conversations, Hamdoun "personally process[ed] transactions on the network's behalf." *Id.*

13

Plaintiffs extrapolate these allegations from the following excerpt from the Treasury Finding, interpreting "his deputy" as a reference to Hamdoun:

> [The United States' Government] has information indicating that a minority owner of [LCB], who concurrently serves as General Manager, *his deputy*, and the managers of key branches are in frequent—in some cases even daily—communication with various members of the [Hizbollah-affiliated drug trafficking and money laundering network,] and they personally process transactions on the network's behalf.

Treasury Finding at 9406; (FAC ¶ 119) (emphasis added).

Hamdoun vigorously disputes Plaintiffs' interpretation. He characterizes the reference as unspecific, "refer[ing] generically, and not by name, to a number of different individuals," and points to the fact that the Government never asserted a claim against him in the U.S. Verified Complaint action. (Defs.' Mem. at 17.)[4]

Factual disputes are not appropriate for resolution on a motion to dismiss, *DiBlasio v. Novello*, 344 F.3d 292, 304 (2d Cir. 2003), and this Court must "accept the plaintiff's recitation of facts as true." *TMT Co. v. JPMorgan Chase Bank*, 2018 WL 1779378, 2018 U.S. Dist. LEXIS 57586, at *10 (S.D.N.Y. Mar. 28, 2018).[5] Accordingly, this Court credits as true for the purposes

---

[4] While it is true that the Government had never asserted any claims against Hamdoun in the U.S. Forfeiture Complaint action, it does not move the needle at all in his favor. For instance, the same can be said for Safa, whom Hamdoun claims is the only "LCB executive" alleged of "any wrongdoing" and whom Hamdoun repeatedly attempts to separate himself from. (*See* Defs.' Mem. at 17.) Hamdoun also contends that the related settlement agreement which lists Hamdoun's position as "General Manager" and not "Deputy General Manager" refutes Plaintiffs' allegation that Hamdoun is the Deputy General Manager whom the Treasury Finding refers to as having frequent contact with the Hizbollah-affiliated criminal network. (*See* Oral Arg. Tr., ECF No.115, at 42:2–43:8; Letter, ECF No. 117, Ex. B at 17.) In addition to this Court's responsibility to refrain from adjudicating factual disputes at this stage, this argument is unpersuasive because (1) the settlement agreement is years removed from the date of Treasury Finding (and the period relevant to this action) and therefore Hamdoun's title could have easily changed in the interim and (2) the earlier-filed U.S. Forfeiture Complaint itself lists Hamdoun's title as Deputy General Manager, as discussed in Note 6, *infra*.

[5] Notably, Judge Schofield accepted this same allegation as true in a different action when granting the plaintiffs leave to amend, in addition to the Second Circuit when on appeal. *Nahl v. Jaoude*, 354 F. Supp. 3d 489, 496 (S.D.N.Y. 2018), *rev'd*, 968 F.3d 173, 177 n.1 (2d Cir. 2020).

of the motion to dismiss Plaintiffs' allegation that Hamdoun was in frequent contact with members of the Hizbollah-affiliated criminal network.[6]

Taking Plaintiffs' well-pleaded, non-conclusory allegations as true, the factual allegations are that Hamdoun had a familial connection to a Hizbollah-controlled entity to which LCB provided banking services—an entity which his brother-in-law owned along with a Hizbollah spokesperson, among others. U.S. Verified Complaint ¶ 47(d). Hamdoun was in frequent, and at times daily, contact with individuals from a Hizbollah-affiliated criminal network as part of a scheme that laundered hundreds of millions of dollars and provided financial to support Hizbollah. (FAC ¶ 119(c).) Plaintiffs contend that Hamdoun personally processed transactions on this criminal network's behalf pursuant to these conversations and in support of Hizbollah. (*Id.*) In fact, for a period spanning 2006 to 2011, the United States Government identified up to $66.2 million that one faction of the criminal network alone laundered through LCB. Treasury Finding at 9405, 9405 n.17. Hamdoun's supervisee granted reporting exemptions to the Customers, exceeding $2.5 million per week, helping Hizbollah to circumvent sanctions specifically designed to impede terrorist activity. (FAC ¶ 104); U.S. Verified Complaint ¶¶ 47(g)(1)–(4). Safa also provided exceptions to at least five other entities (and their principals) related to Hizbollah. U.S. Verified Complaint ¶¶ 47(g)(5)–(6), 48(c)–(d).

These non-conclusory allegations render meritless Hamdoun's argument that the FAC is devoid of factual content implicating his personal involvement. The cases to which he cites that purportedly support his contention actually support the opposite outcome—they illuminate that the FAC indeed contains factual content that meets the plausibility threshold, standing apart from the

---

[6] Moreover, the U.S. Verified Complaint names only one person as having the title of "Deputy General Manager" at LCB: Hamdoun. U.S. Forfeiture Complaint ¶ 47(d). This coupled with LCB's acknowledgment that Hamdoun served as Deputy General Manager during the relevant time period, (*see* Answer, ECF No. 76, ¶ 57), provide this Court with further bases to accept Plaintiffs' allegation.

15

cases he cites which contain no allegations tying the individual defendants to the conduct complained of. *See, e.g., Steven Madden, Ltd. v. Jasmin Larian, LLC*, 2019 WL 294767, 2019 U.S. Dist. LEXIS 10423, at *15 (S.D.N.Y. Jan. 22, 2019) (the allegations were conclusory and "insufficient to establish that [the individual defendant, Steve] Madden, as a corporate officer of a billion-dollar company with thousands of employees, was in any way personally involved with the alleged infringement" activity); *Shostack v. Diller*, 2016 WL 958687, 2016 U.S. Dist. LEXIS 30354 (S.D.N.Y. Mar. 8, 2016) (the complaint lacked "any facts showing that the individual defendants participated, directed, [or] were aware" of the relevant actions). The FAC's factual content here, by contrast, implicates Hamdoun's involvement, including by reciting information from government sources which ascribe illicit conduct to Hamdoun personally.

An accounting of Plaintiffs' non-conclusory allegations and the FAC as a whole sufficiently permits inferences that (1) the Hizbollah Wire Transfers were processed through Hamdoun's direction, if not through his own actions, just as described in the Treasury Finding or (2) Hamdoun culpably participated in or directly oversaw Safa's grant of exceptions to the Customers and/or the execution of the Hizbollah Wire Transfers. *See Kaplan*, 999 F.3d at 865–66 (drawing reasonable inferences in the plaintiffs' favor from the facts pled, and those permissible inferences were sufficient to satisfy certain *Halberstam* elements). Consequently, Plaintiffs have alleged facts that sufficiently connect Hamdoun to LCB's alleged illegal activity. Thus, Plaintiffs have plausibly stated a claim of JASTA relief against him.

## IV.     DEFENDANTS' MOTION TO DISMISS ESTER LELCHOOK'S CLAIMS BROUGHT IN HER PERSONAL CAPACITY IS GRANTED

Finally, Defendants move to dismiss the individual claims of Ester Lelchook, the widow of American citizen David Lelchook, asserting that she does not have statutory standing to sue.[7] Specifically, because Ester Lelchook is not an American citizen, she may only sue in a representative capacity and is thus precluded from bringing her own personal claims. In line with recent decisions in this Circuit, no such cause of action exists for non-American citizens. Ester Lelchook is precluded from bringing claims in her personal capacity as a non-American citizen who thus lacks statutory standing.

The ATA provides that "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States . . . ." 18 U.S.C. § 2333(a). Plaintiffs argue that the ATA's language allows for non-American family members to bring claims for injuries they personally suffered resulting from the death of a U.S. citizen, pointing to the words "his or her estate, survivors, or heirs" as affirmation that such a cause of action exists. Plaintiffs are incorrect.

Although a split in authority exists in this circuit, this Court agrees with those courts holding that the ATA did not create a civil cause of action for personal injuries to non-American citizens. *See Lelchook v. Islamic Republic of Iran,* 2022 WL 7534195, 2022 U.S. Dist. LEXIS 187616, at \*4 (E.D.N.Y. Oct. 13, 2022); *Averbach v. Cairo Amman Bank*, 2020 WL 486860, 2020 U.S. Dist. LEXIS 10902, at \*31 (S.D.N.Y. Jan. 21, 2020), *adopted*, 2020 WL 1130733, 2020 U.S. Dist.

---

[7] "Statutory standing" differs from Article III standing in that the former assesses "whether the statute grants the plaintiff the cause of action that he asserts," instead of the classic Article III elements, which are concrete and particularized injury, likely caused by the defendant, and judicial redressability. *Compare Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 196–97 (2017) (statutory standing) *with TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) (Article III standing).

LEXIS 40430 (S.D.N.Y. Mar. 9, 2020); *Rosenberg v. Lashkar-e-Taiba*, 2016 WL 11756917, 2016 U.S. Dist. LEXIS 87724, at *47 (E.D.N.Y. July 5, 2016).

This Court reads the ATA's language as meaning that the only "injur[y]" that is eligible for redress is that suffered by "[a]ny national of the United States," which is limited to injury to "*his or her* person, property, or business." (emphasis added). In other words, the language does not include as eligible for relief any injury suffered by any non-American national. *See Averbach v. Cairo Amman Bank*, 2020 WL 1130733, 2020 U.S. Dist. LEXIS 40430, at *11 (S.D.N.Y. Mar. 9, 2020) ("Nowhere in the statute does Congress provide remedies for non-nationals claiming damages for personal injuries."); *see also Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 847 (2d Cir. 2021) ("[T]he ATA grants a private right of action *only* to 'national[s] of the United States'.") (emphasis added). The language "his or her estate, survivors, or heirs" instead represents a subclass who may, in a representative capacity, bring a claim on the injured American national's behalf. Indeed, the placement of the subclass "his or her estate, survivors, or heirs" later in the provision and separate and apart from "national of the United States" denotes Congress's intent to relegate the former to a representative subclass. There was no need for Congress to separate the representative subclass if the provision applied to both equally. Moreover, for the reasons persuasively explained by Magistrate Judge Mann in *Lelchook v. Islamic Republic of Iran*, Plaintiffs' position is further rejected. 2020 WL 12656283, 2020 U.S. Dist. LEXIS 221606, at *8–19 (E.D.N.Y. Nov. 23, 2020) (explaining that "[n]othing in the legislative history of the ATA referenced by plaintiffs . . . suggests that Congress intended for the statute to provide a remedy to non-U.S. nationals" and "the statute's authorization for 'estate[s], survivors, or heirs' to bring suit is expressly limited to suits 'therefor' - meaning, for injuries to U.S. nationals") (second alteration in original), *adopted*

*in part deferred in part*, 2022 WL 499901, 2022 U.S. Dist. LEXIS 29855, at *1 (E.D.N.Y. Feb. 17, 2022). Thus, Ester Lelchook's individual claims against Defendants are dismissed.

## IV. CONCLUSION

Defendant Hamdoun's motion to dismiss on Rules 12(b)(2) and 12(b)(6) grounds is DENIED. Defendants' motion to dismiss Plaintiff Esther Lelchook's individual claims for a lack of statutory standing is GRANTED. The Clerk of Court is directed to close the open motion at ECF No. 75.

Dated: March 6, 2024
New York, New York

SO ORDERED.

*George B. Daniels*
GEORGE B. DANIELS
United States District Judge